**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **REGINA M. HOLMES,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| **v.** | : | |
| | : | |
| **JO ANNE B. BARNHART,** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SECURITY,** | : | |
| **Defendant.** | : | **NO. 04-5765** |

<u>**MEMORANDUM AND ORDER**</u>

GENE E.K. PRATTER, J.                                                                 MARCH 26, 2007

Plaintiff Regina M. Holmes challenges the final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Social Security Income ("SSI") provided under Titles II and XVI of the Social Security Act (the "Act"). 42 U.S.C. §§ 401-433, 42 U.S.C. §§ 1381-1383f. Presently before the Court are the parties' cross motions for summary judgment. Because the Commissioner failed to adequately develop the record by ordering a consultative medical expert to evaluate Ms. Holmes's depression and anxiety, the Court declines to adopt the Report and Recommendation, denies the Plaintiff's Motion for Summary Judgment, and denies the Commissioner's Cross Motion for Summary Judgment. The decision of Administrative Law Judge Eugene Wisniewski will be vacated and the Court will remand the case for further development of the record, consistent with this Opinion.

## I.      BACKGROUND

The question presented by this case is whether the Administrative Law Judge adequately developed the record of Ms. Holmes's psychiatric impairments. Ms. Holmes initially pursued her claims for DIB and SSI under the theory that her physical impairments were her primary

disabling conditions.  After her application for benefits was denied, claimant's counsel determined that it was not her physical impairments, but rather her depression and anxiety, that were primarily disabling.  (R. 34.)  Therefore, counsel requested, and was granted permission, to supplement the record with additional mental health evidence, after the hearing.

The post-hearing evidence fairly raises the question of whether Ms. Holmes's depression and anxiety were equivalent to Listing-level.  However, the ALJ in large part failed to discuss this evidence, declined to explain the bases for its rejection, and failed to resolve the conflict between this evidence, and the prior opinion of non-disability submitted by a state agency psychologist, by calling a consultative medical expert.  In light of the conflicting evidence regarding whether Ms. Holmes's depression and anxiety were equivalent to Listing-level disabilities, the ALJ had a duty to order a further medical expert evaluation of Ms. Holmes to adequately develop the record on this significant issue.

### A.      Procedural History

On November 14, 2001, Regina Holmes applied for DIB and SSI, alleging disability since October 9, 2001 due to chronic pain, insomnia, anxiety, and depression.  (R. 93-95, 131, 141, 506-510).  The application was denied upon initial review, and Plaintiff Holmes timely requested a hearing before an administrative law judge.  (R. 72, 76-77, 78-82, 506-510).

An administrative hearing was held on May 7, 2003, and on October 10, 2003, ALJ Eugene Wisniewski issued an unfavorable decision in which he determined that although Ms. Holmes had severe impairments that restricted her from working in certain jobs, (R. 24, 27), she was not disabled within the meaning of the Act.  (R. 26-27).  Thus, Ms. Holmes was found ineligible for DIB and SSI.  (R. 27).

2

The ALJ's decision became final when, on October 13, 2004, the Appeals Council denied Ms. Holmes's request for review. (R. 8-11, 12-15.) Plaintiff filed this civil action on December 13, 2004, seeking judicial review of the Commissioner's decision.

### B.      Factual Background

#### i.      Medical History Prior to the Hearing

Ms. Holmes is a 53-year-old woman with a twelfth grade education and some business school training. (R. 37-38, 137, 190.) She has prior work experience as a clerical specialist, secretary, clerk typist, telephone service representative and telemarketer. (R. 112-122, 132, 190.) Between August 1995 and March 2001, Ms. Holmes worked as a clerical specialist at the Lancaster county Voter Registration Office. (R. 112, 198.) During this time, Ms. Holmes's depression and anxiety became severe. (R. 23, 112, 198.)

In late-August 2000, during a visit to her primary care physician, Ms. Holmes first complained of her mental health. Gail Bodner, M.D., reported that Ms. Holmes was under a lot of stress due to problems with her job, boss, daughter and mother. (R. 250.) She was experiencing insomnia, crying spells and hot flashes, and requested counseling. Id. Dr. Bodner did not refer Ms. Holmes to a mental health professional. However, approximately one month later, in response to Ms. Holmes's chronic lateness to work, her supervisor referred her to a social worker, Peg Cunha, for counseling. (R. 22, 197-198.)

During her session with Ms. Cunha, Ms. Holmes communicated symptoms of depression and anxiety, which problems she connected to her troubles with her work supervisor. (R. 198.) Ms. Cunha observed that in the context of her work-related stress, Ms. Holmes behaved in a passive aggressive manner. Id. For example, Ms. Cunha documented Ms. Holmes's tendency to

3

respond to her supervisor's close observation by arriving to work even later than she would have arrived in the absence of scrutiny.  Id.  Ms. Cunha decided that Ms. Holmes was in need of three-to-four months of mental health treatment, including a psychiatric medication consult as well as education regarding time management and realistic self-talk.  Id.

On November 28, 2000, Ms. Holmes was evaluated by a psychiatrist, Kathleen L. Elnaggar, M.D.  Dr. Elnaggar established that Ms. Holmes had suffered intermittent and repeated bouts of depression, which began at the age of 26, immediately after the birth of her second child. (R. 189.)  Ms. Holmes described her history of emotional and physical abuse, by a previous boyfriend, and described having suicidal ideation.  Id. She described her stressors to include financial problems, family problems and job-related problems.  Id.  She described her work environment as negative and critical, and one where there was a lot of "backbiting."  Id.

Dr. Elnaggar observed that Ms. Holmes exhibited a mild to moderate level of distress, but a normal level of insight and concentration during her mental status examination.  (R. 190.) Although Ms. Holmes's affect was anxious and dysphoric, the Doctor concluded that she was cognitively intact, and her speech, movements, manner, and attitude were all normal and appropriate.  Id.  Plaintiff's thought content had no psychosis, and the examination revealed that her state of agitation at work diminished when she was at home.  Id.  Dr. Elnaggar diagnosed Ms. Holmes with major depression, recurrent, moderate, and reported that her global assessment of functioning ("GAF") was 60-70.[1]  Id.  She prescribed BuSpar and Effexor to treat Ms. Holmes's

---

[1]The GAF scale is used to report and track the psychological, social, and occupational functioning of an individual. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL 32 (4th ed. 2000) (hereinafter "DSM-IV").  GAF is measured on a scale of 0 to 100.  Id. at 33-34.  A score of 60-70 indicates mild symptoms in one area or difficulty in social, occupational, or school functioning.

symptoms, and recommended continued psychotherapy.  Id.  However, Ms. Holmes did not

return to see Dr. Elnaggar for her scheduled follow-up visit.  (R. 191.)

Approximately two months later, on February 7, 2001, and then again on February 20,

2001, Ms. Holmes met with Dr. Bodner.  Ms. Holmes complained of continued insomnia and

crying episodes, as well as increased depression, stress, and panic attacks.  (R. 242.)  Though she

expressed no suicidal or homicidal ideation, Ms. Holmes had resorted to adjusting her own

medications to alleviate her symptoms.  Id.  She informed Dr. Bodner that she was taking her

Effexor but not her BuSpar, because she "did not like it,"[2] and she complained of jitteriness,

tingling and muscle aches.  Id.  Dr. Bodner opined that when, and if, Ms. Holmes took the

Effexor regularly, her depression was well controlled and she did not suffer side effects.  Id.  Six

months later, Ms. Holmes returned to Dr. Bodner and reported that her depression had

diminished after she began regularly taking her Effexor.  (R. 239.)  She was feeling "more her

usual self" and had less trouble with sleeping and with irritability.[3]  Id.

Nearly one year later, on August 7, 2002, Dr. William Myers, a state agency

psychological consultant, reviewed Ms. Holmes's medical records and completed a Psychiatric

Review to determine whether Ms. Holmes suffered a disability meeting the criteria for Listing

12.04.  (R. 326-340.)  Dr. Myers concluded that Ms. Holmes suffered from an affective disorder

_____

[2]Dr. Bodner also noted that Ms. Holmes had been taking Sonata for her insomnia, and
although the drug was effective, Ms. Holmes discontinued usage because she could not afford to
pay for her prescriptions.  (R. 242.)

[3]On August 28, 2002, Dr. Bodner wrote a letter addressed to "Disability People"
containing a summary of Ms. Holmes's medical conditions and history.  Though the letter
focused mainly on her physical ailments, Dr. Bodner opined that Ms. Holmes was disabled due to
her irritable bowel syndrome, severe fibromyalgia, depression and anxiety.  (R. 348-350.)

and depression due to fibromyalgia, which did not meet or equal the Criteria of the Listing.  (R. 326-329.)  He opined that her depression and anxiety resulted in mild restrictions in her activities of living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (R. 337.)  Dr. Myers found that Plaintiff had not experienced any episodes of decompensation, nor was there any evidence to establish the presence of the "C" Criteria of Listing 12.04.[4]  (R. 336-337.)

In addition to the Psychiatric Review, Dr. Myers also completed a mental residual functional capacity ("RFC") assessment for Ms. Holmes, in which he opined that she had moderate limitations in her ability to carry out detailed instructions and in her ability to maintain attention and concentration for extended periods, though she was not significantly limited in other functional categories.  (R. 344.)  Dr. Myers further observed that Ms. Holmes's psychological symptoms did not interfere with her completion of simple tasks.  (R. 346.)  Finally, Dr. Myers noted that although Ms. Holmes took medication for depression, she had not received focused treatment by a mental health professional.  Id.

### ii.    Testimony at the Hearing

On May 7, 2003, an administrative hearing took place at which testimony was given by a vocational expert, Dr. James Ryan.  Dr. Ryan assessed Ms. Holmes's vocational qualifications and history, and considered a hypothetical posed by the ALJ.  (R. 63-71.)  Dr. Ryan testified that based on Ms. Holmes's vocational profile, and her limitations, she could perform a variety of

---

[4]Though Dr. Myers noted Ms. Holmes's history of no-shows and late cancels with mental health professionals, he declined to assess her credibility because she did not attribute any of her own limitations to a mental impairment.  (R. 340, 346.)  Dr. Myers also found it significant that Ms. Holmes was able to care for her four grandchildren.  (R. 338.)

unskilled jobs which exist in significant numbers in the national economy.  (R. 65- 67.)

Plaintiff Holmes also testified at the hearing.  She described the stress in her life generated by her family, and in particular her difficulties with living and caring for her sick mother, who had triple bypass surgery in August 2002, and subsequently developed diabetes and suffered other complications from the surgery.  (R. 58, 62.)

### iii.    Post-Hearing Psychiatric Evidence

The ALJ permitted Ms. Holmes to submit additional psychiatric evidence after the hearing.  Counsel submitted the report of Dr. Jeffrey Willard, who had treated Ms. Holmes during the two-to-three months immediately prior to the hearing.  (R. 49.)  Dr. Willard's notes indicate that from approximately March 2003 through June 2003, Ms. Holmes felt depressed due to the conflicts arising from living with her mother, and generally due to her other social relationships.  (R. 408.)  She reported feeling trapped and having suicidal thoughts, and described having images of throwing herself in front of a train.  Id.   On one particular occasion, Ms. Holmes called Dr. Willard to tell him she was feeling suicidal, and Dr. Willard called a crisis intervention team for immediate intervention.  (R. 409.)

At the conclusion of the sessions in June 2003, Dr. Willard opined that Ms. Holmes required continued therapy, specifically to "learn to take control in relationships."  (R. 406.) Though he had worked with Ms. Holmes to visualize hopeful feelings, to utilize social support that was available to her, and to use her anger at her former employers as motivation to make changes in her own life, Ms. Holmes rejected these suggestions and instead informed Dr. Willard that she placed all of her hopes on receiving disability benefits.  (R. 405.)

Approximately six weeks after her last visit with Dr. Willard, Ms. Holmes was

hospitalized for psychiatric reasons at Lancaster Regional Medical Center. Ms. Holmes stayed at the hospital from July 29, 2003 until August 1, 2003. (R. 428-474.) Though during her admission to the hospital, Ms. Holmes described experiencing depression as well as suicidal thoughts, with no particular plan, these thoughts seemed to dissipate during her stay. (R. 428, 466.) According to the discharge record, Plaintiff was diagnosed with depression, not otherwise specified, and problems with her support system and unemployment, as well as other medical problems. (R. 428.) The hospital staff advised Ms. Holmes to follow up with Dr. Willard on August 4, 2003, however there is nothing in the record to indicate that Plaintiff followed the recommendation. Plaintiff's GAF at discharge was 55-60.[5]

One week later, on August 8, 2003, Plaintiff returned to the emergency room at Lancaster Regional Hospital with increased depression and suicidality. (R. 478.) She informed the emergency room staff that she was just released from the hospital and that she was not ready for release due to the fact that she could not yet handle the conflict between her and her mother. (R. 478, 492.) However, the hospital declined to re-admit Ms. Holmes. (R. 482-483.)

Several days prior to her hospitalization, and then again shortly after the hospital declined her readmission, Ms. Holmes was evaluated by Yvonne M. Foster, LPC CAC, a licensed professional counselor and doctoral candidate. Ms. Foster evaluated Ms. Holmes using the *Structured Clinical Interview for DSM-IV-R*. Her report provides the most in-depth mental health evidence of record, and describes Ms. Holmes's depression and anxiety as equivalent to a Listing-level disability.

---

[5]A GAF of 51-60 represents moderate symptoms (e.g., flat and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. DSM-IV 32.

Ms. Foster diagnosed Ms. Holmes with Major Depressive Disorder, and Personalty Disorder, NOS, with symptoms of Borderline Personality Disorder.  (R. 496-497.)  Though Ms. Holmes did not exhibit signs of psychosis, and although she presented in a well-socialized manner with clear speech and average memory, Ms. Holmes exhibited "a pattern of persecutory beliefs" that appeared to govern some of her reactions and behaviors towards family and job supervisors.[6]  (R. 493.)  She also showed signs of suicidality.  Ms. Holmes informed Ms. Foster that she had recurrent thoughts of death and suicide, particularly whenever she felt rejected by her mother and sister.  (R. 494.)  Ms. Holmes reported that these thoughts of death were the only answers she could find to solve her problems.  Id.  Ms. Foster concluded that her suicidality was the result of a chronic state of depression that restricted her ability to cope with daily stressors. Id.

Ms. Foster opined that Ms. Holmes's mental impairments were largely due to her family dynamics.  The evaluation revealed that Ms. Holmes was born of an alcoholic father, whom she had only seen twice in her life, but who was violent with her mother.  (R. 495.)  Like her mother, Ms. Holmes also suffered physical and emotional abuse in a romantic relationship.  She characterized herself as "a punching bag," for her former boyfriend, who would " would slap and hit [her] and leave black and blue marks" on her body.  (R. 496.)  This former partner, as well as several other of Ms. Holmes's partners, and her brother, suffered substance abuse problems such as cocaine abuse and IV-drug addiction.  Id.

---

[6]Ms. Foster found several facts of particular import in drawing this conclusion.  First, that Ms. Holmes believed that her former boss was sexually harassing her in order to convince her to have her mother sell him her house.  Second, that Ms. Holmes suspected her mother and sister of lying to her when she was "flat broke and needed a pack of cigarettes." (R. 493.)

Ms. Foster diagnosed Ms. Holmes with a <u>DSM-IV</u> Axis I diagnosis of Major Depressive

Disorder, and an Axis II diagnosis of Personality Disorder Not Otherwise Specified,

characterized by the following:

> 'an enduring pattern of inner experience and behavior' . . . that manifests itself
> 'in two or more of the following areas: cognition . . . affectivity . . . interpersonal
> functioning . . . impulse control . . .'  The pattern is 'inflexible and pervasive
> across a broad range of personal and social situations . . . leads to clinically
> significant distress or impairment in social, occupational, or other important
> areas of functioning . . . is stable and of long duration . . . and can be traced back
> at least to adolescence or early adulthood.'

(R. 496, 497) (<u>quoting</u> <u>DSM-IV</u>).

Regarding Ms. Holmes's symptoms of Borderline Personality Disorder, Ms. Foster found

evidence of:  "a pattern of 'unstable and intense interpersonal relationships characterized by

alternating between extremes of idealization and devaluation,'" a "distinct 'identity

disturbance,'" "'impulsivity in at least two areas that are potentially self-damaging,'"

"dysfunctional relationships," "affective instability due to a marked reactivity in mood," and

"transient, stress-related paranoid ideation or severe dissociative symptoms."  (R. 497-498)

(quoting DSM-IV).  Ms. Foster believed these symptoms to have developed as a result her

father's abandonment, and the neglect and physical abuse by her mother and various other loved

ones.  (R. 497.)  Finally, Ms. Foster reported that Ms. Holmes's GAF score was 50[7], which

indicates "[s]erious impairment in adaptive functioning; current level."  (R. 498.)

### iv.    The ALJ's Decision and the Report and Recommendation

An administrative law judge conducts a sequential five-step analysis to determine

---

[7]A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job)."  <u>DSM-IV</u> at 34.

whether a claimant is entitled to benefits.  The ALJ asks (1) whether the claimant is working; if so, the ALJ asks (2) whether the impairment significantly limits the claimant's physical or mental ability to do basic work activities; if the claimant is not working, the ALJ asks (3) whether her impairment matches or equals a listed impairment and thus warrants an award of benefits without further analysis; if not, the ALJ considers (4) whether the claimant can perform her past work; and (5) whether the claimant can perform other substantial gainful work in the national economy. 20 C.F.R. § 416.920.

Based upon the testimony and evidence of record, the ALJ concluded at step three of the analysis that none of Ms. Holmes's impairments were equivalent to any of the disabilities listed in Appendix 1, Subpart P, Regulation No. 4.  (R. 23.)  Specifically with regard to her mental health impairments, the ALJ concluded that while Ms. Holmes's symptoms met the diagnostic "A" criteria of Sections 12.04 and 12.08, they did not result in the degree of functional limitation required in order to meet the "B" criterial of the Listings.  Id.  Furthermore, the ALJ concluded that despite Plaintiff's impairments, she could be expected to make a vocational adjustment to work that exists in significant numbers in the national economy.  (R. 25-27, Finding No. 13.) Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (R. 26-27, Finding No. 14.)

On June 13, 2006, Magistrate Judge Arnold C. Rapoport issued a Report and Recommendation in which he found that the Commissioner's decision of non-disability was supported by substantial evidence and based on an adequately developed record. (R&R 20-30.) Therefore, he recommended that the Court grant the Commissioner's Motion for Summary Judgment and affirm the Commissioner's final decision.  (R&R at 1.)

11

Ms. Holmes then filed three objections to the Report, averring that: (1) the ALJ failed to adequately develop the record concerning her allegedly severe and disabling personality disorder; (2) it is fundamentally unfair for the ALJ, and now the United States courts, to deny her the opportunity and resources provided under the Act to help her develop the underdeveloped issue of her alleged personality disorder; and (3) it is fundamentally unfair to overlook that she, as part of her alleged disorder, does not realize and refuses to recognize that she has any mental disability, which in turn keeps her from seeking treatment and evaluation.  (Pl.'s Objs. ¶¶ 1-3.)

## II.    LEGAL STANDARD

The Court conducts a de novo review of the portions of the Magistrate Judge's report and recommendation to which specific objections have been filed.  28 U.S.C. § 636(b)(1)(C). Therefore, the Court may look to any evidence in the record, regardless of whether the ALJ cites to the evidence in the administrative decision, Esposito v. Apfel, 2000 WL 218119, at *6 (E.D. Pa. Feb. 24, 2000), and "may accept, reject or modify, in whole or in part," the findings and recommendations of the Magistrate Judge.  28 U.S.C. § 636(b)(1).

With respect to the decision of an ALJ, a district court must review the record to determine first whether the correct legal standard was applied, Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001), and then to determine whether the ALJ's decision is supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate."  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995). Whether substantial evidence supports a decision is both a question of quantity, Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983), and a requirement that the administrative decision must be "accompanied by a clear and satisfactory explication of the basis on which it rests."

Diehl v. Barnhart, 357 F. Supp. 2d 804, 808 (E.D. Pa. 2005) (quoting Cotter v. Harris, 642 F.2d

700, 704 (3d Cir. 1981), reh'g denied, 650 F.2d 481 (3d Cir. 1981)).

## III.   DISCUSSION

      Ms. Holmes objects to the Report and Recommendation on the grounds that the record

was inadequate to support the ALJ's erroneous conclusion that her depression and anxiety were

not equivalent to either Listing 12.04 or 12.08,[8] because the ALJ failed to order a consultative

---

      [8] Section 12.04 Affective Disorders: Characterized by a disturbance of mood,
accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged
emotion that colors the whole psychic life; it generally involves either depression or elation.  The
required level of severity for these disorders is met when the requirements in both A and B are
satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:
      1. Depressive syndrome characterized by at least four of the following:
            a. Anhedonia or pervasive loss of interest in almost all activities; or
            b. Appetite disturbance with change in weight; or
            c. Sleep disturbance; or
            d. Psychomotor agitation or retardation; or
            e. Decreased energy; or
            f. Feelings of guilt or worthlessness; or
            g. Difficulty concentrating or thinking; or
            h. Thoughts of suicide; or
            i. Hallucinations, delusions or paranoid thinking; or
      2. Manic syndrome characterized by at least three of the following:
            a. Hyperactivity; or
            b. Pressure of speech; or
            c. Flight of ideas; or
            d. Inflated self-esteem; or
            e. Decreased need for sleep; or
            f. Easy distractibility; or
            g. Involvement in activities that have a high probability of painful consequences
            which are not recognized; or
            h. Hallucinations, delusions or paranoid thinking; or
      3. Bipolar syndrome with a history of episodic periods manifested by the full
      symptomatic picture of both manic and depressive syndromes (and currently
      characterized by either or both syndromes); and
B. Resulting in at least two of the following:

medical expert.

Before this Court is free to determine whether an administrative decision is supported by

substantial evidence, "the Court must first be satisfied that the plaintiff has had a full and fair

hearing under the regulations of the Social Security Administration and in accordance with the

---

     1. Marked restriction of activities of daily living; or
     2. Marked difficulties in maintaining social functioning; or
     3. Marked difficulties in maintaining concentration, persistence, or pace; or
     4. Repeated episodes of decompensation, each of extended duration; or
C. Medically documented history of a chronic affective disorder of at least 2 years' duration that
has caused more than a minimal limitation of ability to do basic work activities, with symptoms
or signs currently attenuated by medication or psychosocial support, and one of the following:
     1. Repeated episodes of decompensation, each of extended duration; or
     2. A residual disease process that has resulted in such marginal adjustment that even a
     minimal increase in mental demands or change in the environment would be predicted to
     cause the individual to decompensate; or
     3. Current history of 1 or more years' inability to function outside a highly supportive
     living arrangement, with an indication of continued need for such an arrangement.
20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

Section 12.08 Personality Disorders:  A personality disorder exists when personality traits are
inflexible and maladaptive and cause either significant impairment in social or occupational
functioning or subjective distress. Characteristic features are typical of the individual's long-term
functioning and are not limited to discrete episodes of illness.  The required level of severity for
these disorders is met when the requirements in both A and B are satisfied.

A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:
     1. Seclusiveness or autistic thinking; or
     2. Pathologically inappropriate suspiciousness or hostility; or
     3. Oddities of thought, perception, speech and behavior; or
     4. Persistent disturbances of mood or affect; or
     5. Pathological dependence, passivity, or aggressivity; or
     6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;
     and
B. Resulting in at least two of the following:
     1. Marked restriction of activities of daily living; or
     2. Marked difficulties in maintaining social functioning; or
     3. Marked difficulties in maintaining concentration, persistence, or pace; or
     4. Repeated episodes of decompensation, each of extended duration.
20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.08.

beneficent purposes of the act." Maniaci v. Apfel, 27 F. Supp. 2d 554, 556 (E.D. Pa. 1998)

(citing Echevarria v. Secretary of Health and Human Servs., 685 F.2d 751, 755 (2d Cir. 1982)

(citation omitted).

The regulations of the Social Security Administration require that disability is determined

based on an adequately developed record.  The burden to develop the record is shared between

the claimant and the ALJ.  Ventura, 55 F.3d at 902.  The claimant's burden to develop the record

regarding her disability is necessary because the claimant is in a better position to provide

information about her own medical condition.  Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987);

see also 20 C.F.R. §§ 404.1512(a), 416.912(a).  However, because of the inquisitorial nature of

Social Security proceedings, even when the claimant is represented by counsel, "it is the ALJ's

duty to investigate the facts and develop the arguments both for and against granting benefits."

Sims v. Apfel, 530 U.S. 103, 111, 130 S. Ct. 2080 (2000).  This duty involves developing a

complete medical history, 20 C.F.R. § 404.1512(d), and at times calling upon a medical expert, §

404.1512(f).

A "complete medical history" consists of the records of the claimant's medical sources

for at least the twelve months preceding the time when the claimant field the application for

disability benefits.  20 C.F.R. §416.912.  Ms. Holmes alleges that her disability began in October

2001.  The ALJ evaluated her medical records dated from January 1996 through August 2003,

including the undated report of Ms. Foster.  (R. 21-24.)  According to the regulations and

relevant case law, the record contains sufficient medical history data to satisfy the standard for

completeness.  Money v. Barnhart, 91 F. App'x 210, 215-216 (3d Cir. 2004); 20 C.F.R. §§

404.1512(d), 416.912(d).

Even when the record contains sufficient medical history data, in certain instances the ALJ's obligation to develop the record may require the ALJ to order a consultative medical expert.  20 C.F.R. § 404.1519.  The requirement arises in two situations: (1) when in the ALJ's opinion, the evidence, though consistent, taken as a whole, is insufficient, or, (2) if after weighing the evidence the ALJ cannot reach a conclusion about disability.  20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

The duty of an ALJ to consult a medical expert is discussed in Social Security Ruling 96-6p (1996).  An ALJ "must obtain an updated medical opinion from a medical expert . . . when additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."  SSR 96-6p, 1996 WL 374180, at *3-4 (S.S.A. Jul. 2, 1996).  "Although they lack the force of regulations, social security rulings are 'binding on all components of the Social Security Administration.'"  Johnson v. Barnhart, 66 F. App'x 285, 289 (3d Cir. 2003) (quoting 20 C.F.R. § 402.35(b)(1)).

 In Johnson, 66 F. App'x at 288-289, our court of appeals held that where the evidence of record suggests equivalence, and where an ALJ has failed to resolve a conflict or explain the bases for rejecting this evidence, the duty to adequately develop the record requires the ALJ to call a medical expert, and a court may remand the case for such a purpose.  Thus, though the regulations and the Ruling accord broad discretion to the ALJ to determine whether to order a medical expert consultation, where the record is "inconclusive," as to whether a disability is Listing-level, the ALJ is required to call a medical expert.  Diehl, 357 F. Supp. 2d at 815.  Stated

differently, where "the record as it exists at the time of the administrative hearing fairly raises the question of whether a claimant's impairment is equivalent to a listing, a medical expert should evaluate it." Maniaci, 27 F. Supp. 2d at 557. See also Hardee v. Barnhart, 188 F. App'x 127, 129 (3d Cir. 2006) (Though an ALJ has broad discretion to determine whether to consult with a medical expert, the ALJ must do so after a "thorough analysis of the medical evidence, including reports and notes from numerous medical professionals.")

In Diehl, 357 F. Supp. 2d at 817-818, the court considered facts similar to those now before the Court and determined that remand was appropriate. Plaintiff Diehl argued that the record was inadequately developed to support the ALJ's determination that his impairment was not equivalent to Listing 12.04, a listing for disabling affective disorders. Id. at 817. As is the case here, the ALJ obtained sufficient medical history evidence, and determined that although the claimant's impairment met the criteria of Part A of the relevant listing, it did not meet the functional criteria of Part B, because the plaintiff had only mild or moderate limitations in the activities of daily living, social functioning, and in maintaining concentration, persistence and pace. Id. at 817.

After a review of the record, and the objections to the magistrate's report, the court found that the ALJ was required to call a medical expert to assess Mr. Diehl. The court reasoned that although the evidence could be viewed as supporting the ALJ's decision, there was already equally probative evidence of record supporting the opposite conclusion. Id. For example, while the evidence suggested that Mr. Diehl was coherent and goal-directed, with no bizarre ideation, delusions, paranoia or hallucinations, there was also evidence of record that Mr. Diehl suffered from anxiety, depression, impulsivity, impatience, and self-control, and evidence that he

17

catastrophized everyday stressors.  Id. at 818.  Like Ms. Holmes, Mr. Diehl's GAF score was 50,

indicating "serious symptoms" such as suicidal ideation.  Id. at 817.  Recognizing that the

evidence did not "clearly qualify" Mr. Diehl as functionally limited according the "B" Criteria of

Listing 12.04, the court nevertheless concluded that the evidence could "reasonably be viewed as

describing a limitation in social functioning or a limitation in maintaining concentration,

persistence or pace." Id. at 818.  The case was remanded to the ALJ to adequately develop the

record by calling a medical expert.

Similar to Diehl, Ms. Foster's report can be viewed as evidence that Ms. Holmes's

impairments limited both her social functioning and her concentration, persistence and pace

under Part B of either Listing 12.04 or 12.08.  Social functioning refers to the capacity to

"interact independently, appropriately, effectively, and on a sustained basis with other

individuals" including "the ability to get along with others, such as family members [or] friends."

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(2).  A "history of "avoidance of interpersonal

relationships, or social isolation" and the ability to "respond[] appropriately to persons in

authority (e.g., supervisors)" are indicators of limitations in social functioning.  Id.

Concentration, persistence, or pace "refers to the ability to sustain focused attention and

concentration sufficiently long to permit the timely and appropriate completion of tasks

commonly found in work settings."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(3).

Ms. Foster diagnosed Ms. Holmes with Major Depressive Disorder (R. 494) and

Personality Disorder with Borderline features.  (R. 497.)  The attributes of Ms. Foster's diagnosis

of Depressive Disorder which can fairly be interpreted as "B" Criteria of social functioning are

Ms. Holmes's pattern of reactivity to her persecutory beliefs, and her history of recurrent suicidal

ideation related to her feelings of being a scapegoat or feelings of being rejected or abandoned from her family system.  (R. 497.)  Likewise, Ms. Holmes's persistent depression since the loss of her job, diminished interest or pleasure in almost all activities, problems with sleep, feelings of worthlessness connected with her inability to provide for herself, and her impaired ability to problem solve and cope with daily stressors, are indications of limitation in concentration, persistence or pace.  Id.  See Diehl, 357 F. Supp. at 818  (inability to deal with daily stressors indicates limitations in concentration, persistence and pace).

The symptoms of Ms. Holmes's Personality Disorder are also probative of the "B" Criteria of limited social functioning and concentration.  Ms. Foster observed that Ms. Holmes needed for others to assume responsibility for most major areas of her life; was unable to maintain continuous work; had difficulty making everyday decisions; demonstrated impaired judgment; and tendency to go to extreme lengths for attention.  (R. 497.)  Similarly, the Borderline attributes of her mental impairments can be viewed as limitations in "B" Criteria. Ms. Foster opined that MS. Holmes's history of abuse, neglect and dysfunction lay the "foundation" for her "pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation"; "distinct 'identity disturbance' marked by an 'unstable self- image or sense of self'"; "high level of 'impulsivity in at least two areas that are potentially self-damaging'"; choice of "relationship partners who were dangerous and/or substance dependent"; "poor decision making and planning skills"; "suicidal ideation"; "affective instability due to a marked reactivity of mood"; and "'transient, stress-related paranoid ideation or severe dissociative symptoms'. . . to the point that [Ms. Holmes] may benefit from further evaluation for a delusional thought disorder."  (R. 497-498) (quoting DSM-IV).

Though the ALJ briefly mentioned Ms. Foster's report, he did not acknowledge the report as evidence that Ms. Holmes met the "B" criteria.  Neither did the ALJ explain why he discredited the report.  Indeed, the administrative decision extracts only minimal detail from Ms. Foster's report, summarily dismissing it as supporting the conclusion that "the claimant has some problems interacting with others":

> Psychological evaluation conducted in July and August 2003 shows the claimant is appropriately dressed and has adequate hygiene; she is oriented; of average intelligence; has adequately organized thought process; appropriate thought content; and no evidence of psychosis but exhibited a pattern of persecutory beliefs and personality disorder with dependent and borderline features.

(R. 23.)  The ALJ also extracted only minimal and supportive detail from Dr. Willard's therapy records.  There is evidence in Dr. Willard's notes that is further indicative of the presence of "B" Criteria of limitation in social functioning:  Despite the Doctor's efforts, Ms. Holmes remained unable to visualize hopeful feelings or even to assemble herself to take walks, go to Church, or participate in other activities to improve her mood, and while under his care, Ms. Holmes suffered an episode of decompensation and suicidality that required crisis intervention.  (R. 405.)  Finally, though the ALJ found " no evidence of significant or persistent complaints," (R. 22), Dr. Elnaggar, one of Ms. Holmes's original treating psychiatrists, observed that Ms. Holmes had a history of depression that began at the age of 26.  (R. 189.)

While the ALJ may properly accept some parts of the medical evidence, and reject other parts, he must consider all the evidence and give some cogent reason for discounting the evidence he rejects, particularly when he rejects evidence that suggests a contrary disposition. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994) (citing Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986); Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d Cir. 1983)).   The ALJ

here has neglected to meet this obligation.

Furthermore, although the ALJ mentioned Ms. Holmes's GAF of 55-50 designated during her hospitalization, he failed to acknowledge that Ms. Foster assessed Ms. Holmes's GAF score to be 50.  The failure to acknowledge a GAF score in and of itself can result in remand, in particular when the GAF score indicates serious symptoms or impairments in social or occupational functioning.  In Span v. Barnhart, No. 02-7399, 2004 U.S. Dist. LEXIS 12221, at *21-23 (E.D. Pa. May 21, 2004), the court remanded a case because the ALJ failed to adequately explain how or why he discounted the significance of plaintiff's GAF scores.  Likewise, the court in Escardille v. Barnhart, 2003 U.S. Dist. LEXIS 11085, at *20-22 (E.D. Pa. June 24, 2003), remanded a case to the ALJ because the ALJ entirely failed to evaluate a physician's report indicating that the plaintiff had a GAF score of 50.   The case now before the Court is at least as worthy of remand.

## IV.    CONCLUSION

Because record contains evidence that fairly raises the question of whether Ms. Holmes suffered a Listing-level disability, and because the ALJ failed to explain his rejection of this evidence, thus inhibiting the Court from considering potentially valid reasons for discounting the evidence, the ALJ must order a consultative medical expert to adequately develop the record. The Court will vacate the Commissioner's decision and remand the case so that the ALJ may call a medical expert to opine as to whether Plaintiff's impairments are equivalent to either Listing 12.04 or 12.08.

BY THE COURT:


GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **REGINA M. HOLMES,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| **v.** | : | |
| | : | |
| **JO ANNE B. BARNHART,** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SECURITY,** | : | |
| **Defendant.** | : | **No. 04-5765** |
| | : | |

## ORDER

**AND NOW**, this 26th day of March 2007, upon consideration of cross motions for summary judgment filed by the parties, the Report and Recommendation of United States Magistrate Judge Rapoport, and the objections thereto, (Docket Nos. 8, 9, 10, 11, 12, and 13), **IT IS HEREBY ORDERED** that:

1.  Plaintiff's Objection No. 1 (Docket No. 13) is **SUSTAINED**; Plaintiff's Objection Nos. 2, 3 are **OVERRULED** without prejudice;

2.  The Report and Recommendation is **NOT ADOPTED**;

3.  The Motion for Summary Judgment filed by the Commissioner (Docket No. 10) is **DENIED**;

4.  The Motion for Summary Judgment filed by the Plaintiff (Docket No. 9) is **DENIED**;

5.  The matters as to which the Objections are sustained are **REMANDED** to the Commissioner of the Social Security Administration for further proceedings in conformity with the accompanying Memorandum.

BY THE COURT:

S/Gene E.K. Pratter
_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE